**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

    vs.                                         No. CR 07-1244 WJ

DONALD SCOTT TAYLOR,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER<br>DENYING MOTION TO SUPPRESS (DOC. 263)</u>

THIS MATTER comes before the Court upon Defendant's Motion to Suppress, filed May 1, 2009 (**Doc. 263**), following an evidentiary hearing which was held on August 13, 2009 and continued on August 14, 27 and 28 of 2009.[1]  This motion seeks suppression of Defendant Donald Scott Taylor's ("Taylor" or "Defendant") allegedly coerced confessions to a Government informant, Donnie "Fat Boy" Wilson ("Wilson"), and all of the evidence obtained as the "poisonous fruit" of these allegedly unlawful and unconstitutional confessions, based on violations of Defendant's Fifth and Sixth Amendment rights under the United States Constitution.  Having considered the parties' briefs, legal memoranda, the testimony presented at the hearing and the applicable law, I find and conclude that there were no violations of Defendant's constitutional rights.  Accordingly, the Motion to Suppress is DENIED.

---

[1]  The Court recently ruled on a portion of the motion to suppress.  Doc. 414.  This Memorandum Opinion and Order addresses the remaining issues and arguments raised by Defendant.

## BACKGROUND

### I.      General Background

Causey, New Mexico is a small, sparsely populated farming and ranching community in the rural eastern part of New Mexico in Roosevelt County close to the Texas state line. Portales, the county seat for Roosevelt County, is the closest city of any size to Causey.

On July 8, 2005, Roosevelt County Sheriff's deputies were dispatched to 112 Main Street in Causey, the residence of Jimmy S. (Bo) Chunn, in reference to the suspicious death of Mr. Chunn. The early stages of the investigation revealed that Mr. Chunn suffered a gunshot wound to the head delivered from a high-powered rifle fired from outside his residence.

Coincidentally, that same day (July 8, 2005) Taylor had a previously scheduled appointment around 1:00 p.m. with his parole officer ("PO"), Jesse Martinez. Taylor had been paroled from state prison and was under supervision of the New Mexico Department of Corrections, Probation and Parole Division. Taylor periodically reported to PO Martinez at the Probation and Parole Office in Portales.

The Portales, New Mexico Police Department was assisting the Roosevelt County Sheriff's Department in the investigation of the Chunn murder. Portales Police Detective ("Det.") Johnny Parker was assigned the task of obtaining warrants and interviewing persons of interest. Det. Parker was interviewing acquaintances of Mr. Chunn and persons in the vicinity of Causey who were under either probation or parole supervision. Since Taylor was on parole and lived and worked for a farmer/rancher named Donald Watson ("Watson") in the Causey area, Det. Parker decided to interview Taylor and made arrangements with PO Martinez to speak with Taylor when he showed up at the Probation and Parole Office.

When Taylor arrived at the Portales Probation and Parole Office, Det. Parker spoke with

Taylor first and asked him some general questions about Mr. Chunn.  At the time Det. Parker interviewed Taylor, he was not a suspect in the Chunn murder, but rather he was only a person of interest.  The interview of Taylor by DET Parker did not constitute custodial interrogation.[2] After DET Parker finished his interview of Taylor, he proceeded to meet with PO Martinez and Jessie Lucero who was a parole re-entry coordinator.  PO Martinez became suspicious that Taylor was consuming alcohol in violation of his conditions of parole so Taylor's car was searched.  Ammunition was found which prompted PO Martinez to have Taylor arrested for possession of ammunition in violation of his conditions of parole. While in state custody, Taylor ultimately ended up at the North Unit of New Mexico State Penitentiary in Santa Fe County, New Mexico (the "North Unit").  Taylor ended up in Level 6 or segregation at the North Unit.[3]

Around September 5, 2005, Taylor and Wilson were placed by law enforcement officials in adjoining cells in level six of the North Unit.  Wilson, a long time member of the Aryan Brotherhood, had previously started cooperating with the FBI and working as an informant.[4] During the time period Wilson and Taylor were housed next to one another, Taylor made various incriminating statements including a detailed confession of the murder of Mr. Chunn which was recorded by Wilson.  Taylor seeks to have all of these incriminating statements suppressed. Taylor also seeks to suppress all the tangible evidence obtained by the Government as a result of

---

[2] *See* Doc. 414 (Court's Mem. Opin. & Order denying Defendant's motion to suppress on this basis).

[3] Level 6 is one of the highest security classifications for inmates at the North Unit. Inmates who are deemed to be security threats end up in Level 6.

[4] A small sum of money was placed in Wilson's prison inmate account.  Once Wilson was released from prison, the FBI paid for all of Wilson's living expenses while he assisted with investigations of other Aryan Brotherhood members.

his statements and actions.

Subsequently, the Defendant was indicted by the Grand Jury and the Superseding Indictment (Doc. 83) charges Defendant with violent crimes in aid of racketeering, including the murder of Mr. Chunn, conspiracy to commit murder, conspiracy to manufacture methamphetamine, and various firearm offenses. According to the Superseding Indictment, Taylor conspired to murder and murdered Mr. Chunn, in exchange for obtaining anhydrous ammonia for the express purpose of manufacturing methamphetamine to benefit the Aryan Brotherhood. Under the Government's theory of the case based on its investigation, Taylor's involvement in the incidents leading up to Chunn's murder began on June 5, 2005, when Taylor met with Michael Brown, an Aryan Brotherhood member from Texas, who had traveled to New Mexico to conduct Aryan Brotherhood business.[5] At the June 5, 2005 meeting, Mr. Brown asked Defendant whether he could obtain anhydrous ammonia, an ingredient used in the production of methamphetamine. Taylor replied that he would check with his employer, Watson, to see if he could gain access to anhydrous ammonia.[6] The Government alleges that Watson agreed to furnish the anhydrous ammonia to Taylor if he killed Mr. Chunn.[7]

---

[5] Michael Brown is a co-defendant in this case on the methamphetamine conspiracy counts. He entered into a cooperating plea agreement with the Government in the early stages of this case.

[6] Donald Watson is a co-Defendant in this case on the conspiracy to manufacture methamphetamine. He is charged in State District Court in Portales with the capital offense of conspiracy to murder Mr. Chunn. The Court severed for separate trial the counts against Watson from the Counts against Taylor. Doc. 181.

[7] The Defendant supposedly sought assistance from Mr. Watson because he was a farmer. Other than its illicit use as a solvent in the production of methamphetamine, anhydrous ammonia is more commonly used by farmers as a nitrogen fertilizer. *See* Doc. 302 (Resp. to Mot. to Suppress) at 3, n.2.

II.     **Defendant's Position**

Although Taylor initially denied to Wilson any involvement in the slaying of Mr. Chunn,

Taylor subsequently admitted to committing the murder of Mr. Chunn for the benefit of the

Aryan Brotherhood "family" and offered information leading to the Government's discovery of

weapons, including the rifle used to kill Mr. Chunn, recovered from an abandoned house on

Watson's property.  Taylor submits that the statements he made to Wilson in the period from

September 2005 through May 2006, including the recorded confession on November 10, 2005,

were made in violation of Defendant's Fifth and Sixth Amendment rights and thus, the

statements including the recorded confession should be suppressed.

Taylor contends that he was coerced by Wilson into falsely confessing to the murder of

Mr. Chunn as a pre-condition to advancing from prospective to full or "made" membership in

the Aryan Brotherhood.  As part and parcel of this argument, Taylor claims that he sought

membership in the Aryan Brotherhood in order to receive its protection against the larger, more

powerful prison gangs in the New Mexico prison system.  According to Defendant, Wilson held

himself out as a violent and dangerous member of the Aryan Brotherhood who had "made his

bones" in Texas by killing a fellow inmate and by committing other acts of violence on behalf of

the Aryan Brotherhood.  Thus, Taylor states he felt obligated to comply with Wilson's demands.

Moreover, Taylor was unaware at the time that Wilson was in fact cooperating with the FBI.

Defendant also asserts that Wilson stated to Defendant that if he unilaterally killed Mr.

Chunn, he would be in violation of the Aryan Brotherhood Constitution and that an

"unauthorized" criminal offense is condemned by the Aryan Brotherhood, possibly leaving the

offending member dead or seriously injured.  Supposedly intimidated and coerced by this

prospect, Taylor confessed to the murder as being committed to advance the interests of the

Aryan Brotherhood and gave information leading to the discovery of incriminating evidence all to seek Wilson's protection and sponsorship for membership in the Aryan Brotherhood.

Defendant asserts that he gave the location where the murder weapon and firearms stolen from Mr. Chun's residence weapons had been placed because Wilson stated that if any evidence of the murder was left behind, such evidence would harm the Aryan Brotherhood.  Wilson assured Taylor that he knew people who could "clean it up."  Believing he was given a direct order by Wilson, Defendant disclosed the secret location where weapons related to the Chunn killing had been hidden, by furnishing Wilson with a detailed map to an abandoned house on Watson's property where the weapons were located.

### DISCUSSION

This motion centers on the suppression of Taylor's recorded statements to Wilson made on November 10, 2005, as well as other statements Taylor made to Wilson leading up to the recorded statements.  There are three components to Defendant's arguments: (1) that Defendant's statements to Wilson were coerced; (2) that those statements violate Defendant's Fifth Amendment rights under *Edwards v. Arizona,* 451 U.S. 477 (1981); and (3) that the statements violate Defendant's Sixth Amendment rights under *Massiah v. United States,* 377 U.S. 201, 204 (1964) and *Escobedo v. Illinois,* 378 U.S. 478, 490-91 (1964).  Defendant also raises other constitutional arguments which the Court will address.

**I**.     **Whether Defendant's Statements to Wilson Violate the Fifth Amendment Under**

**    *Edwards v. Arizona***

In August of 2005, Taylor was transferred from the Southern New Mexico Correctional facility to the North Unit. On or about September 5, 2005, officials from the FBI arranged to have Taylor placed in a cell next to Wilson.

Taylor contends that statements made to Wilson should be suppressed because Taylor had previously invoked his right to counsel after being *Mirandized*,[8] in violation of his Fifth Amendment rights as defined by the Supreme Court in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880 (1981). In order for an *Edwards* violation to occur, the suspect must invoke his right to counsel and he must subsequently be subjected to custodial interrogation. The *Edwards* rule is not offense specific, which means that under the Fifth Amendment, once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be re-approached regarding *any* offense until counsel is present.   See  *McNeil v. Wisconsin,* 501 U.S. 171, 177 (1991).

Defendant argues that he was entitled to counsel under *Edwards* when he made his statements to Wilson and because he was not afforded counsel, all of those statements must be suppressed. There is no dispute that Taylor had invoked his right to counsel prior to his transfer to the North Unit.

 Taylor cites to *U.S. v. Alexander*, 447 F.3d 1290 (10th Cir. 2006) for the proposition that a defendant who has asserted his right to remain silent and to the assistance of counsel cannot be coerced into waiving that right.  However, *Alexander* does not advance Defendant's cause because it ultimately found no Fifth Amendment violation occurred. The two inmates in *Alexander* were friends and co-defendants who had both been involved in an attack on another inmate.  The defendant had earlier invoked his right to remain silent.  The Tenth Circuit held that the defendant's conversation with the co-defendant did not violate defendant's Fifth Amendment rights, even though prison officials enabled the conversation by placing them in adjoining cells.

---

[8] *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

*Id*. at 1295-96.  The court found that an agency relationship does not develop "where the government is an incidental beneficiary of another party's actions, even where the government admittedly facilitates the conversation that leads to the suspect's decision to reinitiate questioning." *Id*. at 1297.  The Tenth Circuit's holding turned, in part, on the fact that defendant voluntarily chose to reinitiate questioning with the FBI even though he did so to keep his friend and co-defendant from being labeled a "snitch."

Defendant's argument is foreclosed by the United States Supreme Court case of *Illinois v. Perkins*, 496 U.S. 292 (U.S.,1990). *Perkins* concluded that conversations between a suspect and an undercover agent do not implicate the concerns underlying *Miranda*, because such conversations do not amount to custodial interrogation.  The Supreme Court observed that *Miranda* "was not meant to protect suspects from boasting about their criminal activities in front of persons whom they believe to be their cellmates." 496 U.S. at 296.  The *Perkins* court distinguished custodial interrogation from conversations which do not implicate the Fifth Amendment:

> The essential ingredients of a "police-dominated atmosphere" and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. Coercion is determined from the perspective of the suspect. . . [internal citations omitted]. . .[W]hen a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking. . . [internal citation omitted]. There is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess.

*Perkins,* 496 U.S. at 296-297.

Taylor attempts to distinguish *Perkins* because of the way the Government orchestrated Wilson's interrogation of Taylor.  This is no distinction at all because the cellmate in *Perkins* was an undercover agent and he was placed in a jail cellblock next to the defendant for the same

8

reason the Government placed Taylor next to Wilson.  Further, the law makes no distinction between whether the defendant relays the information voluntarily or by prearrangement with the Government.  *See U.S. v. Stubbs*, 944 F.2d 828, 832 (11th Cir. 1991) ("*Miranda* and Fifth Amendment concerns are not implicated when a defendant misplaces her trust in a cellmate who then relays the information – whether voluntarily or by prearrangement- to law enforcement officials").

Taylor did not know that Wilson was working with the FBI, and thus any questioning by Wilson or any statements he made to Taylor were not done in an environment that could be described under *Perkins* as inherently coercive; thus, the Fifth Amendment is not implicated. *See also Alexander v. Connecticut*, 917 F.2d 747 (2nd Cir. 1990) (Fifth Amendment self-incrimination rights of prisoner were not violated by his murder confession given to acquaintance visiting him in jail, who was secretly acting as agent for government, even though prisoner had not been given his *Miranda* warnings).

Defendant also attempts to limit *Perkins* only to situations where the defendant has not been given *Miranda* warnings, citing to this language:

> As the case comes to us, it involves only the question whether *Miranda* applies to the questioning of an incarcerated suspect by an undercover agent. Nothing in the Court's opinion suggests that, had respondent previously invoked his Fifth Amendment right to counsel or right to silence, his statements would be admissible. If respondent had invoked either right, the inquiry would focus on whether he subsequently waived the particular right. . . . Since respondent was in custody on an unrelated charge when he was questioned, he may be able to challenge the admission of these statements if he previously had invoked his *Miranda* rights with respect to that charge.

*Perkins*, 496 U.S. at 300.  This language is not controlling since it is taken from a footnote in Justice Brennan's concurring opinion.  Further, under the reasoning set out in the majority opinion, the pivotal question is whether a coercive environment exists.  If it does not, there is no

need for *Miranda* warnings to be given.

Therefore, Defendant's assertion of Fifth Amendment violations based on *Edwards* has no merit. Accordingly, the Court denies that part of the motion to suppress asserting an *Edwards* violation.

**II.      Whether Taylor's Statements to Wilson Were Coerced**

Taylor also contends that his statements to Wilson were coerced. Taylor claims he said what he felt he was required to say in order to gain membership in the Aryan Brotherhood so that he could seek its protection from other violent gangs in the prison system. He also claims that he felt he was under threat of potential harm by committing an offense that was unauthorized by the Aryan Brotherhood. However, based on the evidence and testimony elicited at the hearing, the Court finds that Defendant has not shown that either fear or coercion played a role in his recorded confession or in any other statements he made to Wilson.

Wilson testified that he knew beforehand that Taylor would be placed in the cell next to his, on level six in the segregation unit. He had approached the FBI about turning Government witness when he decided to turn around his life, and was instructed by FBI Special Agent Theodore Griego ("SA Griego") to see how much Taylor knew about Mr. Chunn's murder. The two inmates communicated by speaking into a small heating vent on the floor of their cells and by "fishing" written notes from one cell to another. The vent traveled under the cells on the floor of the segregation unit and was described as being much to small to make human passage possible.

Wilson described several conversations he had with Defendant. The initial conversation was through the heating vent shortly after Taylor was placed on level six next to Wilson's cell. The conversation was superficial, with the two inmates getting to know each other. The subject

10

of the murder came up peripherally when Taylor explained that he was incarcerated on a parole violation, and claimed that he was being accused of killing Mr. Chunn.  He denied involvement in the murder.  Wilson remembers that at one point, Defendant mentioned that he knew who Wilson was – that he had "gotten his bones" in Texas.   Based on the testimony given at the hearing, the implication was that Wilson was a person of authority within the Aryan Brotherhood.

Shortly after this first conversation, Wilson "fished" a note sent by Taylor through the vent, bringing up a coded letter and newspaper clippings.  Later out in the yard, Defendant asked Wilson if he had received the clippings and the letter.[9]  In the letter, Taylor wrote that he had left eight guns at the "old house" and asked if a "bro"[10] could pick them up.  The subject of the newspaper clippings was Mr. Chunn's murder.  Wilson later asked Defendant through the vent whether he had anything to do with the murder and Defendant admitted that he did.  When Taylor began talking about the murder, Wilson told Defendant not to talk about it through the vent because other inmates could be listening.

Wilson had another conversation about a day later in the recreation yard.  According to Wilson, Taylor filled in the details of the Chunn murder, explaining how Michael Brown asked Defendant to obtain anhydrous ammonia, and how Defendant agreed to kill Mr. Chunn in exchange for Watson getting the anhydrous ammonia.  Taylor described the murder as well as the murder scene when he returned a couple of days later.   During the time in which he was

---

[9]  Exhibits of notes, letters and other documents referenced herein are part of the record from the hearing on Defendant's Motion to Suppress. Defendant also provided Wilson with a "key" to decode the letter.  Wilson testified that it is not uncommon among inmates, including Aryan Brotherhood members, to write in code.

[10] "Bro" refers to an Aryan Brotherhood member.

housed next to Taylor, Wilson "fished" other items sent through the vent by Defendant, including a letter in code describing the murder, and a coded letter in which Taylor stated that he had left guns in a closet in the "old house."

Wilson testified that Defendant frequently mentioned – at least four or five times – that he wanted to "earn his patch"[11] for membership in the Aryan Brotherhood, and that he felt he had earned his "patch," or "blood tie" by murdering Mr. Chunn in exchange for obtaining the anhydrous ammonia for the Aryan Brotherhood.  Wilson stated that Defendant would have known that as a ranking member in the Aryan Brotherhood, he could have helped Defendant earn his "patch" by contributing his vote.  Wilson told Defendant that in order to earn his vote for a "patch," Defendant would have to tell him the circumstances of Chunn's murder.

Sergeant Arturo Suazo ("Sgt. Suazo"), a corrections officer at the North Unit during the time Taylor was incarcerated, testified at the suppression hearing.  Sgt. Suazo described how the events leading up to the recording of Taylor's confession were coordinated with Wilson.  He testified that on November 9, 2009, he gave Wilson a jacket with a recording device to be used the following day during his conversations with Taylor.  The conversation took place in the recreation yard (or "Jurassic Park," as referred to by the inmates) when a "shakedown" was staged in order to get the inmates out in the yard.[12]  Wilson told Taylor that it was Taylor's "time to shine. . . ."   Wilson asked for a "run down on what happened on the Fourth of July."

The lengthy transcript of the recorded conversation between Taylor and Wilson (Govt's Ex. 21) is, like the other evidence and documents mentioned in this Memorandum Opinion and

---

[11] "Patch" refers to a tattoo symbolizing or showing Aryan Brotherhood membership.

[12] Because both Wilson and Taylor were in adjoining but segregated cells, a recorded conversation was not possible without getting both inmates in an area outside the cells.

Order, part of the record made at the hearing on the Motion to Suppress.  The transcript contains Taylor's confession to the murder of Mr. Chunn.  It is worth mentioning some of the highlights from the conversation.  Taylor described to Wilson in detail how Michael Brown requested the anhydrous ammonia; how Taylor "struck a deal" with Watson to obtain the anhydrous ammonia in exchange for making Mr. Chunn "turn[ ] up to be missing"; how Taylor approached Mr. Chunn's house, saw Mr. Chunn through the window sitting in his chair and how Taylor positioned himself for a "clean shot"; how he shot Mr. Chunn in the head and then placed the rifle in an old abandoned house.  Taylor then told Wilson that he returned to Mr. Chunn's house on July 7, 2005, several days after the murder, to rob the house.  In the conversation, Taylor referenced the "directions" (i.e., the maps) he had given to Wilson showing the location of the abandoned house on Donald Watson's property where Taylor hid the guns ("tools") he had stolen from the Chunn house in addition to the murder weapon.  Taylor also stated that his "lifelong dream was to "tie" with the Aryan Brotherhood.[13]  In fact, Taylor had already selected his "patch" design - a swastika with a sword running through it.  In short, the transcript is an unmistakable admission by Defendant that he committed the murder of Mr. Chunn and that he had done so in order to advance his position within the Aryan Brotherhood.

Defendant raises two theories for suppression of the recorded confession: (1) that  Taylor was coerced into making the statements and that he gave details about the crime in a manner he alleges was rehearsed under Wilson's prodding; and (2) that Wilson's testimony is not credible.

The first theory is premised on Taylor's alleged fear of Wilson's reprisal if Taylor did not admit to the killing.  Taylor asserts that his admission regarding the Chunn murder was in

---

[13]  At the hearing, Wilson explained that to "tie" means to gain full membership in the Aryan Brotherhood.

13

response to Wilson's "direct order" to do so.  Also, Defendant claims that his desire to join the Aryan Brother originated from a need for the group's protection from other gangs within the prison system.  Neither of these theories is grounded in any of the testimony or evidence presented at the hearing.

Wilson testified that the FBI made the judgment calls regarding what work he would do as a Government informant, based on Wilson's truthful disclosure about his past criminal activity. Based on Wilson's conversations with SA Griego, Wilson understood that he was expected to abide by certain rules, including no lying, violence or coercion.  Wilson understood that these rules were still in effect when Taylor was placed in the adjoining cell in the segregation unit.  Despite defense counsel's efforts to show inconsistencies in Wilson's testimony about his past criminal history through an extensive cross-examination, Wilson's credibility stood firm along with the evidence which corroborated his testimony. Wilson's inability to remember specific dates is understandable, given that the dates of the events in question spanned over a fifteen-year period of numerous arrests and releases during his young adult life.   In contrast, Wilson's conversations with Taylor took place only a few years ago, and Wilson had the opportunity to review statements to refresh his memory concerning these conversations prior to giving his testimony at the hearing.

Defendant focuses on his initial denial of the Chunn murder to argue that the subsequent admission of the murder must have been coerced.  However, Wilson stated that such denial by Taylor would be expected until he could have confirmed Wilson's identity as an Aryan Brotherhood member.  Moreover, once Defendant elaborated on his involvement in the Chunn murder to Wilson, Defendant did not recant those admissions.  Wilson testified that Taylor initiated the sending of the notes and maps showing where the stolen guns were kept, as well as

14

the coded notes referring to Defendant's involvement in the murder.  According to Wilson, Defendant intended to sell the guns for money, and give part of that money as a "tithe" to the Aryan Brotherhood.  Taylor also initiated the conversations about Mr. Chunn's murder as well as the inquiries about the status of his "patch," which culminated in the November 10, 2009 "interview" between Wilson and Taylor.

Perhaps the most compelling piece of evidence to rebut Defendant's argument that  his statements to Wilson were coerced is the recorded confession itself.[14]  Defendant claims that the details he provided about the Chunn murder were prompted by Wilson and rehearsed before the interview took place.  In other words, the admissions regarding the murder were not voluntary.

No one could listen to the tape recorded conversation and come away with the impression that any of Taylor's statements were coerced.  Defendant's tone during the lengthy conversation was one best described as easy bantering and good humor.  He was casual in his sometimes gratuitous description of the more grisly details of the Chunn murder.  Laughter interjected some of his statements.

During the "interview," Defendant told Wilson that he stored the rifle which he used to murder Mr. Chunn in an "old house" and that he returned to the Chunn house to "confiscate" Mr. Chunn's guns (which included four rifles and a Derringer handgun) and $150.00.  Taylor brought up the subject of a vote for his "patch," stating that he wanted some acknowledgment for having committed the Chunn murder.  Taylor asked Wilson for support in Taylor's "lifelong dream" to "tie" with the Aryan Brotherhood, and Wilson gave Taylor his support, telling him

---

[14]  The exhibits admitted at the hearing include both a compact disc of the November 10, 2005 recorded conversation between Wilson and Defendant, as well as a transcript of the recording.

that he had earned one of the three required votes for Aryan Brotherhood membership.

Neither Defendant's statements on November 10, 2009, nor the tone used in the conversation, could fairly be described as deferential to Wilson or suggesting intimidation. The conversation between the two inmates frequently meandered to incidentals, such as coffee makers, unavailability of the cartoon network at the prison, "Archie" and "Jughead" comic books, library duty and exchanging eyeglass frames.   Defendant also told Wilson that he dreamed of being a serial killer and that he was interested in learning about demonology and its rituals.  These topics of conversation do not convey in the slightest degree that Taylor was feeling coercion sufficient to force him to lie about a murder he did not commit.  In sum, the Court is not persuaded to any degree that there was any level of coercion or intimidation going on in Taylor's conversations with Wilson.

Defendant's theory of coercion and intimidation is also hard to buy when one considers the various notes, letters and maps which Wilson described as being sent by Taylor.  It is hard to imagine how Defendant could be "coerced" or "intimidated" into sending or "fishing" these items through a tiny vent to Wilson in the adjoining cell.  No physical contact was possible between inmates in the cells on level six of the North Unit.  Even in the recreation yard, inmates were kept in mesh cages.  A quick backward handshake was possible on occasion when inmates passed each other leaving their cells for the yard.

As part of Taylor's coercion argument based on intimidation by Wilson, Taylor also argues that he was forced to talk about the murder of Mr. Chunn in response to a direct order from Wilson.  There are several reasons why there is no basis to this argument.  Wilson testified that an Aryan Brotherhood member is not required to discuss or make any disclosures about an uncharged crime, even if a higher-ranking Aryan Brotherhood member issued a direct order, and

16

that as a prospective member, Taylor would have known this.[15]  At the time Taylor confessed the crime to Wilson on November 10, 2005, Taylor was not charged with the murder of Mr. Chunn.  Wilson stated that it was common knowledge that the Aryan Brotherhood would want to minimize discussion regarding an uncharged crime.  Also, Wilson stated that he could not require Taylor to talk about an ordered hit unless he had issued the order.  Wilson did tell Taylor that "Zac"[16] wanted to know if he had killed Mr. Chunn.  However, under the chronology of events as presented at the hearing, Defendant had already admitted to killing Mr. Chunn prior to Wilson telling Defendant that "Zac" wanted to know about the murder.

Defendant contends that he was forced to admit to the murder in order to avoid reprisal from the Aryan Brotherhood for committing a murder without "authorization."  This contention is based on one of Wilson's purported statements to SA Griego, namely, Wilson's statement to Taylor that it would be a violation of the Aryan Brotherhood constitution to kill Mr. Chunn without being authorized to do so by the leadership of the Aryan Brotherhood.  SA Griego testified at the hearing and explained that the way he recorded the statement did not accurately convey what Wilson told him.  SA Griego clarified that he understood Wilson to mean that the commission of a crime unauthorized by the Aryan Brotherhood is dangerous where the individual brags that the crime was an Aryan Brotherhood directive when in fact it was not.  Wilson corroborated SA Griego's explanation of this statement.  Wilson stated that an individual

---

[15]  Based on Defendant's briefs, Defendant does not deny that he was a prospective member of the Aryan Brotherhood, but contends that he was forced into applying for membership for "protection" from other prison gangs.  The Court addresses this argument below.

[16]  According to Wilson, inmate and Aryan Brotherhood member Zac McVey was Wilson's Aryan Brotherhood "mentor."

was free to commit any crime on his own, without reprisal from the Aryan Brotherhood as long as that individual did not falsely claim that it was an Aryan Brotherhood directive.

Thus, no testimony or evidence presented at the hearing supports Taylor's argument that he was forced to admit he killed Mr. Chunn for the benefit of the Aryan Brotherhood either in response to a direct order, or to avoid reprisal.  Wilson unequivocally denied any statements or actions which would make Taylor feel he should fear for his safety.   Wilson testified that he did not threaten to spread rumors that Taylor was a child molester or snitch if he did not admit to the murder.  Wilson did not offer to "protect" Taylor in prison in exchange for Taylor talking about the murder.   In fact, since Taylor did not testify at the suppression hearing, there was no direct evidence presented to support his theories of coercion, only innuendo and argument.

The cases on which Defendant relies are factually inapposite, and therefore not helpful.  *See Arizona v. Fulminante,* 499 U.S. 279 (1991); *U.S. v. McCullah,* 76 F.3d 1087, 1101 (10th Cir. 1996) and *Lam v. Kelchner*, 304 F.3d 256 (3rd Cir. 2002).  In those cases, unlike this case, there was evidence that the defendants' statements were extracted in order to avoid a threat of harm. In *Fulminante*, the confession was the direct result of extreme coercion.  The FBI informant in that case was an inmate masquerading as an organized crime figure.  The defendant was serving time on federal charges of possession of a firearm by a felon.  The informant heard a rumor that defendant was earlier suspected of killing a child in Arizona, and used this rumor to tell the defendant that in order to get his help, defendant would have to tell him about the killing. [17]  The defendant in *Fulminante* knew his life was in jeopardy as a suspected child killer, and ultimately confessed to the sexual assault and murder of the child.  In *Fulminante*, there was

---

[17] It is generally known in the context of prison environments that child killers or molesters are not looked upon favorably by other prison inmates.

evidence of the direct exploitation and extreme coercion that led to the confession.   Here, one would have to read into the Aryan Brotherhood constitution that Taylor's statements to Wilson were extracted by a direct order and that Taylor understood that order as a threat.  The evidence and testimony points to the contrary – Taylor initiated discussion about the murder and made it clear that his admissions were a way to achieve his "lifelong" dream to advance from Aryan Brotherhood prospect to Aryan Brotherhood  member.

In *McCullah*, there was evidence of an active threat to kill the defendant, and the confession was an exploitation of this active threat.  Here, Taylor had no named enemies in his prison records.  In *Lam*, state police officers posed as gang members who threatened violence in a recorded conversation if she refused to pay money in order for them not to expose her role in a murder.  The Third Circuit held that based on a totality of the facts assumed by the state court,[18] Lam's will was "overborne by the officers' threats of violence" and were made under duress. 304 F.3d at 267.  The court held that Lam's statements should be suppressed.  In the instant case, Taylor's recorded conversation held no such element of coercion or fear.  In fact, as the Court has made a point of demonstrating by the conversation's highlights, Taylor seemed to be casually enjoying the encounter.

The absence of evidence of coercion or intimidation continued through the time Taylor talked to Wilson on November 10, 2005, and afterward.  Evidence was presented at the hearing that Defendant gave Wilson the telephone numbers for members of his family as well as his parents' home address so that Wilson could go to their house after he was released to pick up stolen goods.  Simply stated, the evidence does not support any inference of coercion or intimidation.

---

[18]  The petitioner/defendant in *Lam* sought habeas corpus relief.

Finally, Defendant claims that he felt pressure to become a member of the Aryan Brotherhood – hence, an explanation of his status as a prospective member – as a way to get protection from prison abuse.   However, the testimony and evidence presented at the hearing depicts Taylor as someone who has no problem taking care of himself in a prison environment. Defendant's prison record shows that he listed no named enemies (except himself) and that there was no "active threat" evidence.  Wilson testified that membership in the Aryan Brotherhood actually requires that a prospective member demonstrate an ability to stand up and defend himself and that he knew from personal experience that Taylor was very capable of making threats.  This was supported by evidence presented at the hearing in the form of Defendant's written threat to a non-Aryan Brotherhood member who dared to sport a swastika tattoo. Additionally, the Government has filed supplemental notices (Docs 370 and 382) wherein it sets forth thirty-seven separate incidents of assaults on guards and other inmates in support of the Government's contention that upon conviction, the jury should impose the death penalty against Taylor partly because of the role of future dangerousness of Taylor if he is not executed.  The Court sees no need to discuss these alleged thirty-seven incidents other than to note that collectively, they demonstrate that Taylor is not one to be intimidated by anyone.

In sum, the testimony and evidence are overwhelming that Taylor's statements were not coerced, that he initiated the incriminating communications to Wilson, and that Taylor's admissions concerning membership in the Aryan Brotherhood were genuine and not given out of fear or threat of potential harm either by Wilson or other inmates.  Thus, Taylor's motion to suppress his statements to Wilson, including his November 10, 2005 recorded confession, based on asserted violations of the Fifth Amendment is denied.

20

**III.     Violation of Sixth Amendment**

Defendant argues that the Government violated his Sixth Amendment rights when he was not provided any access to counsel after he became the principal suspect in the killing of Mr. Chunn, relying on *Massiah v. United States,* 377 U.S. 201, 204 (1964) and *Escobedo v. Illinois,* 378 U.S. 478, 490-91 (1964).  Taylor contends that his Sixth Amendment right to counsel should have attached in this case by November 10, 2005, when Wilson recorded the conversation of Taylor's membership "interview."  Defendant contends that statements to Wilson made in the North Unit from the period from September 5, 2005 through November 10, 2005 should be suppressed because he was not provided any access to counsel after he became the principal suspect in the killing of Mr. Chunn.

Defendant contends that the Government violated his Sixth Amendment rights because Defendant's right to counsel attached on November 10, 2005 based on these factors: (1) Taylor had already invoked his right to counsel and refused to speak about the case without an attorney present; (2) the investigation had been focused on him for months; (3) the Government controlled and manipulated Taylor's custodial assignments solely to initiate and tape a conversation between Taylor and Wilson; (4) the Government specifically instructed Wilson to interrogate Taylor in a custodial environment which Taylor could not control; (5) the Government purposefully delayed the initiation of any criminal charges until after Wilson obtained a tape recorded confession; and (6) the Government relied on its agent, Wilson, to not only surreptitiously extract a confession from Taylor but also to encourage the specific, incriminating details.  Mot. at 41.

The Court finds that Defendant is attempting to stretch the protection of the Sixth Amendment beyond what is envisioned in either *Massiah* or *Escobedo*. The right to counsel

under the Sixth Amendment is offense specific and in general, prevents the Government from interfering with a defendant's right to counsel after criminal charges have been filed. *See*, *e.g.*, *Illinois v. Perkins*, 496 U.S. 292, 299 (1990). In *Massiah*, the Supreme Court held that the Sixth Amendment right to counsel prohibits the use at trial of statements by a defendant which are elicited by government agents after the right to counsel has attached. *Massiah* does not address the claim that Taylor's right to counsel attached before being criminally charged because the defendant in *Massiah* had already been indicted when an undercover agent used a cooperating witness to elicit incriminating statements from the defendant. Here, Taylor was not indicted until June 2007, the day the grand jury issued the original indictment.[19]

*Escobedo* may appear to support Defendant's position that an individual may have a Sixth Amendment right to counsel prior to being charged with a crime, but the facts which led the Supreme Court to come to that conclusion are very different from the facts which Defendant uses for his argument. The Sixth Amendment violation in *Escobedo* occurred because the police failed to honor the defendant's request to consult with his lawyer during the course of an interrogation. The Supreme Court found:

> . . . where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out the process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and has been denied an opportunity to consult with a lawyer, and the police have not warned him of his absolute constitutional right to remain silent, the accused has been denied "the Assistance of Counsel" in violation of the Sixth Amendment.

378 U.S. at 479.

---

[19] The record is clear that when Taylor was arrested on July 8, 2005 and taken into custody, the basis for the arrest was on a violation of his conditions of parole by being a felon in possession of ammunition. Thus, when Wilson had contact with Taylor, his status was a state parole offender not a federal defendant charged in this case.

Taylor does not assert that he requested counsel at any time during his conversations with Wilson, so the Court fails to see how Taylor can rely on *Escobedo* to establish a Sixth Amendment right to counsel.  Defendant misapplies *Escobedo*'s description of what it means to "focus" on an accused.  It is not simply a subjective belief that the defendant committed the crime.  *See, e.g., Stansbury v. California*, 511 U.S. 318, 325 (1994) ("It is well settled . . . that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*"). *Miranda*, which was decided subsequent to *Escobedo*, described custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."   384 U.S. 436, 444 (U.S. 1966).  In short, the Court finds that Defendant's view of what it means to "focus" on an accused is not supported by Supreme Court precedent, including *Miranda*.

Other than *Escobedo*, Defendant offers no other legal support for his contention that the Sixth Amendment right to counsel attached before he was indicted.  *Illinois v. Perkins*, 496 U.S. 292 (1990), discussed above in the context of a Fifth Amendment *Edwards* violation, also militates against Defendant's position.  In *Perkins*, the Supreme Court noted that the defendant did not have a Sixth Amendment claim because no murder charges had been filed at the time of questioning by Government agent posing as a fellow inmate.  *Id.* at 293.

Accordingly, the Court denies Defendant's motion to suppress on a Sixth Amendment basis as well.

## IV.    Deliberate Delay in Arraignment

Defendant contends that his statements to Wilson should be suppressed due to a concerted and deliberate delay in arraigning Taylor under Rule 5 of the Federal Rules of

Criminal Procedure.  Rule 5 provides that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer." The rule also requires that an arrested person be arraigned "without unnecessary delay" and courts look to 18 U.S.C. § 3501[c] to determine whether pre-arraignment statements obtained in violation of Rule 5(a) are admissible.[20]

The Government is correct that Rule 5(a) of the Federal Rules of Criminal Procedure applies only to arrests made by or for a federal official for a violation of a federal law.  It has no application to arrests made under state law for state offenses. *U.S. v. Buck*, 449 F.2d 262, 270 (10th Cir. 1971); *see U.S. v. Alvarez-Sanchez*, 511 U.S. 350 (1994) (duty to present a person to a federal magistrate does not arise until the person has been arrested for a federal offense).  When Taylor confessed to murder on November 10, 2005, he was in the custody of the State of New Mexico serving a sentence for state police violations and not under arrest for any federal offense. Thus, Rule 5(a) does not apply to the instant case.

Defendant bases his argument primarily on an exception to the Rule 5 requirement of a federal arrest which is triggered when there is improper collusion or collaboration between federal and state officers. *See U.S. v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994).  He argues that Taylor's confession was the result of improper collaboration that existed between state and

---

[20] Rule 5(a) is a codification of case law starting with *McNabb v. United States*, 313 U.S. 332 (1943) and ending with *Mallory v. United States*, 354 U.S. 449 (1957) ("McNabb-Mallory rule").  It is essentially an exclusionary rule which renders inadmissible in federal cases any confession obtained from a detained arrestee who was not brought before a judicial officer "without unnecessary delay."  In *Corley v. United States,* — U.S. —, 129 S.Ct. 1558, 1562 (2009), the Supreme Court modified the McNabb-Mallory rule by stating that a confession shall not be inadmissible solely because of delay in presentment if the confession is found by the trial judge to have been made voluntarily and within six hours of arrest.

federal authorities and that state law enforcement authorities were aware of Taylor's potential involvement in the death of Mr. Chunn and the FBI's involvement in the case.  Taylor also contends that the decision to transfer him from the Southern New Mexico Correctional Facility to the North Unit was instigated by the Government (under the guise of a request from the Roosevelt County Sheriff) for the sole purpose of obtaining a tape recording of Taylor's incriminating statements.

Routine cooperation between local and federal authorities does not constitute improper collusion.  *See Alvarez-Sanchez*, 511 U.S. at 360 ("Only by such an interchange of information can society be adequately protected against crime").  In fact, the *Alvarez-Sanchez* court declined to disturb the district court's finding that there was no evidence that a collusive arrangement existed between state and federal agents.  *Id*.  Thus, the question here is whether Taylor's statements to Wilson regarding his alleged role in Mr. Chunn's murder were obtained during the period of detention in which he can demonstrate the existence of improper collaboration between federal and state or local officers.  *Alvarez-Sanchez*, 511 U.S. at 359 (citing *Anderson v. United States*, 318 U.S. 350 (1943)).

The Court agrees with the Government that there is no basis to apply the Rule 5 exception here, since there is no showing that the State of New Mexico held Taylor illegally.  *See U.S. v. Woods*, 613 F.2d 629 (6th Cir. 1980) (statements made to FBI agents while in state custody not inadmissible where federal detention had not yet begun, and there was no indication that the relationship between local and federal authorities was "illegitimate" or that the state officials had unlawfully detained defendant in order to allow federal investigator to secure a confession).  At the time of the Chunn murder, Taylor was under supervision by state probation and parole officials as a result of being paroled from prison after serving time for aggravated

25

assault relating to the time Taylor brought a loaded shotgun into the Wal-Mart Store in Portales, New Mexico.  Clearly, the State of New Mexico had a legitimate basis for arresting and detaining Taylor on July 8, 2005 for violating parole conditions and the arrest and subsequent detention of Taylor by state officials had no connection to the murder of Mr. Chunn four days earlier.  Defendant's motion to suppress is denied on this basis as well.

## CONCLUSION

With regard to Defendant's alleged Fifth Amendment violation based on *Edwards v. Arizona,* 451 U.S. 477 (1981), the Court finds and concludes that Taylor's environment was not inherently coercive when he made statements to Wilson while incarcerated at the North Unit. Thus, those statements shall not be suppressed.

With regard to Defendant's assertion that his statements to Wilson were coerced and thus in violation of the Fifth Amendment, the Court finds and concludes that the evidence and testimony presented at the hearing do not support this argument.  Taylor's statements to Wilson were clearly voluntary and not made under threat or intimidation of any kind.

With regard to Defendant's Sixth Amendment based on right to counsel based under *Massiah v. U.S.*, 377 U.S. 201 (1964) and *Escobedo v. Illinois*, 378 U.S. 478 (1964), the Court finds and concludes that there is no legal or factual support for Defendant's contention that Sixth Amendment right to counsel attached before the time at which he was indicted in this case.

With regard to Defendant's contention that the Government's deliberate delay in arraignment violated Fed.R. Crim.P. 5(a), the Court finds and concludes that there is no reason to apply the exception to Rule 5(a) in that Defendant has not shown that the relationship between local and federal authorities was "illegitimate" or that the state officials had unlawfully detained defendant in order to allow federal authorities to secure a confession.

Finally, as a result of the Court's findings and conclusions herein, Defendant's request to suppress weapons and stolen property seized as a result of maps and other information given to Wilson shall be denied.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress is hereby **DENIED** in its entirety.

_____
UNITED STATES DISTRICT JUDGE